IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JEREMY DANIEL CONERD,<br><br>Defendant. | No. CR14-2040<br><br>REPORT AND RECOMMENDATION |

On the 22nd day of May 2015, this matter came on for hearing on the Motion to Suppress (docket number 18) filed by the Defendant on May 11. Additional evidence was received by the Court when the hearing continued on June 2. The Government was represented by Special Assistant United States Attorney Ravi T. Narayan. Defendant Jeremy Daniel Conerd appeared in person and was represented by his attorney, Raphael M. Scheetz.

## I. PROCEDURAL HISTORY

On September 10, 2014, Defendant Jeremy Daniel Conerd was charged by Indictment with possession of ammunition by a felon and unlawful user of a controlled substance. Defendant appeared on April 20, 2015 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on June 22, 2015.

On May 11, 2015 Defendant timely filed the instant motion to suppress. The Government filed its resistance on May 18. With the Court's permission, both parties filed post-hearing briefs on June 9. Because of the pending motion to suppress, the trial was continued to August 3, 2015.

## II. RELEVANT FACTS

Late in the evening on November 27, 2013, the Oelwein Police Department received a call from Jessica Pirtle. Pirtle reported that she had just received a call from Defendant's sister. Defendant's sister told Pirtle that she had received a call from Defendant, in which Defendant stated that he had assaulted Travis Norton in his basement and was in the process of assaulting Megan Owens. Defendant also reportedly told his sister that he was going to Lamont, where he was going to shoot her. Officer Ted Phillips was dispatched to Defendant's home, arriving at approximately 11:30 p.m.

Officer Phillips testified that he was familiar with Defendant, Travis Norton, and Megan Owens. Phillips had previously arrested Norton for possession of narcotics, and Owens had reported multiple domestic assault incidents throughout the year prior to these events. Phillips was also familiar with Defendant's home. Defendant had lived there "for quite some time" and Phillips had been there before on domestic issues. The last time Phillips was at the house, prior to these events, involved a report that somebody had kicked in Defendant's door.

Upon arriving at the scene, Officer Phillips parked on the street, but not directly in front of the house. Government's Exhibit 1 is a photograph showing Defendant's residence from the vantage point where Phillips parked. The dispatcher told Phillips that the assault was occurring in the basement, and Phillips testified that "I could see that the light in the basement was on plainly from where I was parked." Phillips exited his vehicle and approached the residence on the sidewalk. Phillips testified he was also able to see that the light in the basement was on as he was approaching on the sidewalk. The light on the floor above it was not on. As Officer Phillips approached the residence, he did not hear any sounds coming from inside the residence. Specifically, he heard no yelling or other loud voices. There was no indication from the exterior of the house that an assault may be taking place inside.

2

According to Officer Phillips, he had previously received information from multiple informants and another officer that Defendant may be in possession of a firearm. Phillips also believed Defendant had a closed circuit camera installed that targeted the front of the house. Phillips testified that he was "somewhat worried" for the safety of Norton and Owens, and was concerned about his own safety. Accordingly, rather than simply walk up to the front door and knock, Phillips decided to walk towards the basement window "to see if I could observe anything through that window, so I would know what I was walking into as I knocked on the front door as I continued with the welfare check."

Officer Phillips then walked up the neighbor's driveway, entered on the side yard, and approached the basement window.[1] According to Phillips, he "walked up the driveway a bit, until I could see through that window." Phillips testified that he saw "movement" in the basement. Specifically, Phillips saw Defendant and Norton standing by "what looked to be an old end table or an old wooden stand of some sort," with Norton raising a glass pipe to his mouth and ingesting what Phillips believed was an illegal narcotic.[2] Phillips testified that he was 5-6 feet from the window when he made the observations. According to Phillips, "it didn't require any acrobatics, you know, to see through the window just from the angle where I was in relation to the window."

On cross-examination, Officer Phillips was asked whether there was any bush covering the basement window. Phillips responded "not that I recall," but then

---

[1] A close-up view of the window is shown on Government's Exhibit 3. Defendant testified that the house has been sided since he lived there, and the window has been replaced. Apparently, however, it is the same size and shape.

[2] Officer Phillips has been a police officer for approximately 20 years, with approximately the last 10 years at the Oelwein Police Department. He is a certified methamphetamine lab investigator, and he is familiar with paraphernalia associated with methamphetamine use.

acknowledged that "there was foliage on the side of the house, but not that blocked the view." Specifically, Phillips testified that "I didn't have to move any objects to look in the window."

Government's Exhibits 1, 2, and 3 were taken after these events and do not show any bushes or foliage on the side of the residence. Defendant's Exhibit A is an aerial photograph of the area.[3] While it is difficult to see, the photograph appears to show bushes on the west side of the house.[4] The height or configuration of the bushes cannot be determined from the aerial photograph. Defendant testified that there was a "giant bush and tall grass" located in front of the basement window. According to Defendant, the bush reached a window air conditioner which he had placed in the first floor window directly above the basement window. Defendant testified that it would have been impossible to see in the basement window without manipulating the bush. According to Defendant, it would have been necessary to "crawl behind the bush" to see in the basement window.

After observing the activities in the basement, Officer Phillips called off the second unit that was en route to the scene, and advised him to meet at the police department so they could obtain a search warrant. A search warrant was issued, and the house was subsequently searched pursuant to the warrant.

### III. DISCUSSION

In his motion to suppress, Defendant argues that Officer Phillips violated the Fourth Amendment when he entered onto the side yard of the property without a warrant, and peered in the basement window.[5] In its resistance, the Government argues that Phillips'

---

[3] The subject residence is on Lincoln Drive, immediately north of Third Avenue.

[4] The date when the aerial photograph was taken is unknown.

[5] Defendant does *not* assert any defect in the search warrant subsequently obtained
(continued...)

4

actions were justified by exigent circumstances and, alternatively, by the emergency aid and community caretaker doctrines. In its post-hearing brief, the Government argues — for the first time — that the side yard was not part of the home's curtilage.

The Fourth Amendment protects persons "against unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, ____ U.S. ____, 133 S. Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

The Fourth Amendment's protection against unreasonable governmental intrusion applies equally to the area immediately surrounding a person's home.

> This right [to be free from unreasonable governmental intrusion] would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

*Jardines*, 133 S. Ct. at 1414. Accordingly, the law regards "the area 'immediately surrounding and associated with the home' — what our cases call the curtilage — as 'part of the home itself for Fourth Amendment purposes.'" *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

---

[5](...continued)
by Officer Phillips, or argue that the warrant was not supported by probable cause. Instead, Defendant argues that the information upon which the warrant is based was obtained illegally, and the warrant is "fruit" of that illegality.

Turning to the instant action, the Government now argues when Officer Phillips entered onto the side yard, he did not invade the home's protected curtilage. I disagree. As the United States Supreme Court recently noted in *Jardines*, the Fourth Amendment's protection against unreasonable governmental intrusion "would be of little practical value if the State's agents could stand in a home's porch or **side garden** and trawl for evidence with impunity." 133 S. Ct. at 1414 (emphasis added). The cases cited by the Government in its supplemental brief are easily distinguished. For example, in *United States v. Bausby*, 720 F.3d 652 (8th Cir. 2013), the defendant displayed a motorcycle with a "For Sale" sign on it, thereby inviting persons to come onto the protected curtilage. Another case cited by the Government, *United States v. Cousins*, 455 F.3d 1116 (10th Cir. 2006) — a Tenth Circuit case decided prior to *Jardines* — suggested that the presence of an electric meter weighed against a finding of curtilage. The Government notes in the instant action that a gas meter is shown on the house near the basement window. It cannot reasonably be argued, however, that a meter reader's implied license to enter onto the property to read the gas meter authorizes a police officer to enter onto the property at 11:30 p.m. If that is a law, then the Fourth Amendment would have little application to the exterior of a residence.

It is well-established that a search within a home — or in this case a search conducted after entry upon the home's curtilage — without a warrant is presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). However, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the presumption may be overcome in some circumstances. *Kentucky v. King*, \_\_\_\_ U.S. \_\_\_\_, 131 S. Ct. 1849, 1856 (2011). The Government has the burden of overcoming the presumption of unreasonableness that attaches to all warrantless entries. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

"One well-recognized exception [to the warrant requirement] applies when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *King*, 131 S. Ct. at 1856 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). One exigency obviating the requirement of a warrant is the need to assist persons who are threatened with injury. *Brigham City*, 547 U.S. at 403. This is commonly referred to as the "emergency aid" exception. "[T]he Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence." *Ryburn v. Huff*, \_\_\_\_ U.S. \_\_\_\_, 132 S. Ct. 987, 990 (2012).

In the instant action, the dispatcher told Officer Phillips that Defendant stated in a phone call that he had assaulted Travis Norton in his basement and was in the process of assaulting Megan Owens. According to Phillips, Owens had reported multiple domestic assault incidents throughout the year prior to these events. Phillips had been to Defendant's home before on domestic issues. When Phillips arrived at Defendant's house, the lights on the first floor were not on, but he could see a light on in the basement (where the assault was allegedly occurring). Phillips had information that Defendant may be in possession of a firearm, and also believed Defendant had a closed circuit camera targeted to the front of the house. Concerned about his safety, and the safety of the alleged victims, Phillips decided to look in the basement window "so I would know what I was walking into."

I believe Officer Phillips' actions were not unreasonable and, therefore, were not violative of the Fourth Amendment. *King*, 131 S. Ct. at 1856 ("The ultimate touchstone of the Fourth Amendment is 'reasonableness.'"). Phillips was told that Defendant may have assaulted two persons in his basement, and that the assault may be ongoing. Phillips knew that Defendant and one of the victims had previously been involved in domestic assaults. This information, combined with finding a light on in the basement as he

approached the house, suggested the information provided by dispatch was credible. Phillips could not simply ignore the report and walk away. Because he had information that Defendant may possess a firearm and have a closed circuit camera targeting the front of the house, however, safety concerns deterred Phillips from simply walking up and knocking on the door. Under the totality of the circumstances, I believe the emergency aid exception authorized Phillips to enter onto the curtilage of the house and look through the basement window.

Defendant makes much of his claim that a bush in front of the basement window would have prevented Officer Phillips from simply looking in at a distance of five or six feet. Defendant claims it was necessary for Phillips to crawl behind the bush to make the observations which were subsequently included in the search warrant application. I find Phillips' version of the events to be more credible. In any event, I find the dispute over the condition of the bush to be largely irrelevant. That is, the Government does *not* assert that the activities in the basement were within the "plain view" of the officer while he was standing in a public place. Instead, the Government argues that if Phillips entered onto the curtilage of the house and conducted a search, then the search was authorized under an exception to the warrant requirement. If Phillips' warrantless entry onto the side yard was authorized by the emergency aid exception to the warrant requirement — and I believe it was — then any manipulation of the bush in order to see inside the basement would be similarly authorized.

## IV. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 18) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. ***The parties are reminded that pursuant to Local Rule 72.1, "[a] party***

*asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."* Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on May 22 and June 2, 2015.

DATED this 10th day of June, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA